UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 10-74-P-H |
| | ) | |
| TREZJUAN THOMPSON, | ) | REDACTED VERSION |
| | ) | |
| Defendant | ) | |

### AMENDED[1] RECOMMENDED DECISION ON MOTION TO SUPPRESS

The defendant, charged by indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Indictment (Docket No. 11), moves to suppress any and all evidence obtained as a result of a November 24, 2009, stop by Lewiston, Maine, police of a car in which he was the sole passenger. Hearing was held before me on September 8, 2010, and October 6, 2010. The defendant was present. Seven witnesses testified for the government, and three government exhibits and four defense exhibits were admitted. I now recommend that the court make the following findings of fact and deny the motion.

### I. Proposed Findings of Fact

On the night of November 23, 2010, Sergeant Anthony R. Harrington, Jr., of the Auburn Police Department was on patrol in his marked police truck. He was supervising patrol on the 7 p.m. to 6 a.m. shift. He had seen the defendant in connection with domestic cases involving Kristen Coolidge, who had an active protection order against the defendant at the time. At 12:46

---

[1] The only changes in this amended recommended decision are the following: on page 1, "sergeant" replaces "lieutenant" as the rank of Anthony R. Harrington, Jr.; on page 2, "Detective Chad Syphers" replaces "Officer Wayne Syphers"; and on page 6, the name "Harrington" replaces the name "Daigle" in the antepenultimate sentence of the first full paragraph.

1

a.m., a call came in reporting a fire at Coolidge's Academy Street address, and Harrington went to the scene.

Harrington spoke with Coolidge at a friend's house, and then Detective Chad Syphers told him what Coolidge had told Syphers. Syphers put out a "BOLO" ("be on the lookout") for the defendant because Coolidge said that the defendant had been calling her all night and after 11 p.m. had called and said that he was in her apartment and wanted to know whose "stuff" was in "his" drawer in her apartment. These calls were a violation of the order of protection. Syphers told Harrington that Coolidge had said that the defendant had a weapon and that he might be in possession of a 9 mm. handgun. Another "BOLO" had been issued earlier for the defendant, based on Coolidge's complaint that the defendant had stolen her truck.

The next morning, Officer Bernice Mowatt of the Auburn Police Department also spoke with Coolidge, with whom she had dealt previously in domestic assault cases involving the defendant. Nicole Beaucage was with Coolidge during this conversation. Coolidge told Mowatt that the defendant had been calling and texting her via cell phone up until the time of the fire. Mowatt told Harrington and Syphers about this. Mowatt did not attempt to corroborate Coolidge's statements.

When Harrington returned at 7 p.m. to begin his next shift, he was informed that a call had just come in from Nicole Beaucage at the Big Apple convenience store; she said that the defendant was outside the store. Officer Alfred James Daigle heard either Harrington or the other lieutenant say that they had probable cause to arrest the defendant for violation of a protective order because he had made several calls to Coolidge prior to the previous night's fire at her residence. Harrington and Corporal Steven D. Gosselin of the Auburn Police Department drove to the Big Apple. While they were en route, they were informed that the defendant was in

2

a silver rental vehicle that had left the scene; they were given the license plate number for that car, Maine RNTIT29. When they arrived at the Big Apple, Conrad "Perley" Childs told Gosselin that the defendant had threatened him with a gun.

Harrington and Gosselin left Officer Michael Chaine of the Auburn Police Department to speak with Childs and drove in the direction in which the silver car had travelled. Chaine was the second officer after Gosselin to arrive at the Big Apple. A female identified herself to Chaine as the 911 caller. She told Chaine that she knew the defendant through his former girlfriend, that she was fearful of him, and that when she saw him get out of the car at the Big Apple, she ran into the restroom and called 911. She said that the defendant had been speaking with a man who was still at the store. The man was Jeffrey Garland, whom Chaine knew from previous incidents.

Garland said that he did not know who Trezjuan Thompson was, but that he had been speaking with a man he knew as CJ. Chaine knew that the defendant had used CJ as a street name. Garland said that CJ had been a passenger in a car and that he had spoken with CJ. Chaine next spoke with Childs, whom he also knew. Childs called the defendant Trezjuan and told Chaine that he had told Gosselin that the defendant had gotten out of the car and put his hands in his pants as if he had something there, and Childs felt threatened by that. He said that he had not actually seen a gun and had not been verbally threatened. Chaine did not share any of the information he obtained from Garland or Childs over the radio and was not present at the traffic stop.

Gosselin located the silver car on Cedar Street in Lewiston and reported by radio that he was following it. Gosselin saw the passenger ducking down away from the headrest on his seat and relayed this observation over the radio. Harrington, while driving to that location, had a

3

conversation with Gosselin and the dispatcher about whether there was probable cause to arrest the defendant. Tim Lare, a dispatcher who also worked for the Androscoggin County district attorney as a paralegal, told the dispatcher with whom Harrington and Gosselin were speaking that the district attorney had declined to seek an arrest warrant for the defendant based on Coolidge's claims that her truck had been stolen by the defendant and that he had been calling her prior to the night of the fire in violation of the protective order. The dispatcher relayed this information to Harrington, who responded that they nonetheless had probable cause to arrest the defendant for violation of the protective order for the telephone calls made immediately before the fire and for the incident at the Big Apple.

Harrington and Gosselin planned to perform a high risk or felony stop of the silver car on a side street because of the allegation that a weapon had been involved at the Big Apple. They communicated with the Lewiston Police Department and several of its vehicles responded. Gosselin initiated the stop when the car turned onto Main Street in Lewiston by turning on the blue lights on his cruiser. The car pulled over and Gosselin and Harrington boxed it in with their cruisers. Gosselin advised that he could see the defendant in the front passenger's seat and Harrington could see a female driver. Daigle, having monitored the radio traffic, also came to the scene. He also drew his gun, although he did not get closer than 20 to 30 feet from the silver car.

Also responding to the scene after the Lewiston Police Department received a call for assistance with a felony stop were Officers Levesque, Wayne Clifford, and Vega from that department. Officer David M. Levesque responded from the Lewiston police station. He knew what the defendant looked like and had been told that the defendant had displayed a handgun in an incident in Auburn. He stopped his vehicle next to Gosselin's car and went around to

Gosselin's position. He did not draw his weapon at any time during the stop. Officer Clifford did draw his weapon, but he was serving as backup, providing cover for the officers who were effecting the stop.

Gosselin began shouting instructions to the occupants. He and Harrington both had their guns drawn, but Harrington's was not pointed toward the car. He held it in the "low ready" position. They were joined by Officer Daigle from Auburn and an officer from Lewiston. The stop was not recorded on camera or video. Video and audio were not available because the Big Apple call had come in while officers were inspecting that equipment on their cruisers at the start of the shift. The inspection sheet for this equipment had not been completed, so it could not be used.

Gosselin told the operator to get out of the car and walk backward toward him. She did so, holding her hands above her head. Gosselin asked her if the passenger was the defendant; she confirmed that it was. She was handcuffed by Officer Levesque of the Lewiston Police Department and taken to a cruiser behind the ones that boxed in the silver car. She appeared to be scared and nervous. Levesque concentrated on handcuffing the driver, whom he did not recognize, and putting her into the rear of Gosselin's cruiser. Gosselin then told the defendant to get out of the car. He then asked Daigle to take over the commands because he had a better view of the passenger side of the car.

The defendant got out, knelt at Daigle's command, and was placed in handcuffs. He was arrested for violation of the protective order. After the defendant was out of the car and secured, Levesque and two other officers checked to see if anyone else was in the car. No one else was in the car. After Harrington talked to the driver of the car, he told the Lewiston officers that they could search the car. Harrington said that he had consent to search the car. Daigle searched the

defendant for weapons or contraband and placed him in Daigle's vehicle. Harrington asked Daigle to take the defendant to the police station to be questioned about the fire, among other events. The entire stop took two to five minutes. Neither Daigle nor the defendant was on the scene when the silver car was searched. Daigle did not hear anyone asking for consent to search the car and had left the scene before the gun was found.

Harrington told Officer Levesque to uncuff the driver, who was then standing outside a cruiser, because she was not under arrest. Her name was Lindsay Mercier. She said the defendant was her boyfriend, and that her father had rented the silver car but she was the only person who drove it. When Harrington asked for her consent to search the car, she said without hesitation that the car could be searched. When asked if there were any weapons in the car, she asked whether she would get in trouble if the defendant put something in the car. She said that she didn't know whether the defendant put anything in the car, but that she was afraid of him and that it was possible he had done so. Gosselin did a patdown search of Mercier and took some money from her pockets. Gosselin did not hear Harrington ask for consent to search the car. Mercier did not appear to be more nervous or scared than others whom Gosselin had subjected to a felony traffic stop. Harrington, Levesque, and Clifford searched the silver car. Clifford found the gun under the spare tire in the trunk of the car. Government Exhibits 3 and 4 are photographs that Clifford took of the search scene that night.

During the morning of November 24, 2009, an e-mail was sent to the Auburn Police Department from the district attorney's office indicating that Officer Hammerton's request for an arrest warrant for the defendant for stealing Coolidge's truck was going to be denied. Harrington was not aware that the protective order had been dismissed that morning. The Auburn Police

Department was told at 9:30 that morning that neither party to the protective order had shown up in court.

Gosselin had arrested the defendant previously for violation of conditions of release and domestic assault. He knew that the defendant was subject to a protective order that told him to stay away from Coolidge's address and to have no contact with her.

## II. Discussion

The defendant's attack on the admissibility of the gun, apparently the only evidence generated by the traffic stop, is three-fold. First, he contends that the stop of the silver car was invalid, because the officers did not have probable cause to do so. Second, he challenges his arrest. Third, he contends that any consent to search that might have been given by Mercier was coerced and involuntary and thus ineffective.

### A. The Stop

In oral argument following the second day of hearing, the attorney for the defendant emphasized that all of the Auburn police officers must be deemed to have been aware, based on the morning e-mail, that the Androscoggin County district attorney's office had declined to seek an arrest warrant based on Coolidge's allegation that the defendant had stolen her truck and had called her numerous times and that a paralegal in the district attorney's office had said that there was no probable cause to arrest the defendant on the basis of those allegations. But, as the government attorney made clear in her oral argument, the government does not rely on those allegations as the source of probable cause to stop the silver car or to arrest the defendant. It relies instead on Coolidge's allegations about prohibited contact since the earlier allegations about her truck, the defendant's alleged presence in her apartment shortly before fire, and the reports of the defendant's activities at the Big Apple store shortly before the stop and arrest.

7

First, the appropriate test by which to judge the validity of a traffic stop is not probable cause; it is whether the officers involved have a reasonable and articulable suspicion of criminal activity. *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001). "[R]easonable suspicion does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime." *Id*. Here, the officers had reasonable, articulable suspicions that the defendant was in the car, that he had violated a protection from abuse order, that he had threatened someone with a firearm, and that he was a person prohibited from possessing a firearm[2] who was carrying one.

Counsel for the defendant argued that any suspicion that the defendant had violated a protection from abuse order could not be reasonable, because the basis for that suspicion could only be the complaints of Coolidge, which had been rejected by the district attorney as insufficient to support an application for an arrest warrant in the absence of corroboration. He cited *Florida v. J.L.*, 529 U.S. 266 (2000), in support of this contention. But, that case deals with the indicia of reliability of an anonymous tip. *Id.* at 268. There was no anonymous tipster in this case. Nor, contrary to counsel's characterization, could it reasonably be said that Coolidge "had been determined by the district attorney to be unreliable," let alone that this judgment had been passed along to the Auburn police. Nothing in the e-mail (Defendant's Exh. 3) can reasonably be construed to evaluate Coolidge's statements in general. The circumstances of this report of harassing telephone calls were quite different from those involved in Coolidge's claim that the defendant had stolen her truck. Here, she said that the defendant, in addition to making many more harassing calls, had told her during one such call that he was in her apartment and the fire

---

[2] Harrington testified that he knew the defendant from prior domestic cases in Auburn. Gosselin testified that he had arrested the defendant twice for domestic assault and violation of conditions of release. Daigle testified that he had been present at previous arrests of the defendant.

in that building had broken out shortly thereafter. This was sufficient information to allow the officers to suspect that the defendant had violated the protective order.

Counsel also argued that the officers could not have reasonably believed that the defendant had displayed a gun or had threatened anyone at the Big Apple because Garland told Gosselin that he didn't know any "Trezjuan" and that the person he spoke with was known to him as CJ, and because, after Harrington and Gosselin left the Big Apple in pursuit of the silver car, Childs told Chaine that he never saw a weapon and that the defendant never verbally threatened him. Gosselin testified that he knew that CJ was a street name used by the defendant, so the fact that Garland did not know CJ's real name makes no difference in the reasonable-suspicion calculus. Chaine testified that he did not relay Childs' amplification of his statement to anyone before the defendant was arrested. Chaine's report sets forth Childs' statement as follows:

> Jeffrey [Garland] went over to speak with the black male passenger (Trezjuan). Trezjuan got out of the [silver] car and walked towards Perley with his hand down the front of his pants in a man[ne]r that resembled someone reaching for a weapon. Perley retreated to his vehicle. Trezjuan then returned to the silver car and fled the area[.] Perley stated that he never saw a weapon and Trezjuan never verbally threatened him, though he felt afraid.

Defendant's Exh. 10 at 1.

While, as a general rule, " where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop[,]" *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002), Chaine was not involved in executing the stop in this case and, in addition, imputing knowledge that he obtained while other officers were already involved in executing the stop of the car in which the defendant was a passenger to those officers would impose an unreasonable restriction

9

on law enforcement officers. This was information that they could not possibly have obtained before stopping the car, unlike, for example, the information in the e-mail from the district attorney's office that was received fairly early in the morning and could have been conveyed to the officers involved in the stop at the start of their shift at 7 p.m. that day.[3]

Finally, counsel also contended that articulable suspicion is not the appropriate legal test for the validity of the stop in this case because the officers "intended all along" to arrest the defendant, even before the call came in from the Big Apple. The relative timing of the call and the shift meeting at 7 p.m. when the Auburn officers did discuss arresting the defendant if they encountered him is not at all clear from the evidence. Assuming *arguendo* that the sequence proposed by the defendant is correct, I conclude, as discussed *infra*, that the officers had probable cause to arrest the defendant when they did so without regard to the denial of Officer Hammerton's request that the district attorney's office seek an arrest warrant based on Coolidge's earlier claims that the defendant had been harassing her with telephone calls and had stolen her truck. Accordingly, even if the officers had intended "all along" to arrest the defendant and only stopped the silver car in order to do so, there was no constitutional violation.

Counsel also seemed to suggest that the legal standard justifying a "full felony stop," with officers' guns drawn, is higher than that for a stop that does not involve a show of weapons by the officers. He cited no authority for this position, and I am aware of none. In this case, the officers had been told that the defendant was armed and had threatened someone very recently with a firearm. That information is sufficient to justify their show of weapons at the beginning of the stop. *See, e.g., United States v. Jones*, 759 F.2d 633, 639 & nn.7-8 (8th Cir. 1985).

---

[3] [REDACTED]

### B. The Arrest

The defendant's attack on the validity of his arrest at the scene of the traffic stop is much less detailed than his challenge to the stop itself. He notes that Maine law allows law enforcement officers to make felony arrests without warrants, so long as there is probable cause to do so. Motion to Suppress Evidence (Docket No. 20) at [2]. In oral argument, his attorney asserted that there was no probable cause for the arrest, but offered no specific arguments that differed from those raised in the challenge to the stop of the silver car.

The government offered little more, asserting that the officers had probable cause to arrest the defendant, once they had identified him as the passenger in the car, for violation of the protection-from-abuse order. Government's Objection to Defendant's Motion to Suppress (Docket No. 29) at 8.

> Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime. The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances. Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006) (citations and internal punctuation omitted).

The evidence that I have already discussed meets this standard.

### C. The Search of the Car

The defendant also contends that the search of the silver car during which the gun was discovered was invalid. Before discussing the merits of this argument, however, it is necessary

11

to address the government's contention that the defendant lacks standing to challenge this search. I ordered the parties to submit memoranda on this issue at the close of the first portion of the hearing on the motion to suppress, and they have done so. Docket Nos. 58 & 59.

The right of a passenger in a vehicle that has been stopped by law enforcement officers to contest a subsequent search of the vehicle is analyzed under *Rakas v. Illinois*, 439 U.S. 128 (1978). A passenger who asserts neither a possessory nor a property interest in a vehicle "would not normally have a legitimate expectation of privacy" in the vehicle that would be protected by the Fourth Amendment. *Id*. at 148-49. A criminal defendant has standing to challenge the admission of evidence only if its seizure violated his or her own Fourth Amendment rights. *See United States v. Maguire*, 918 F.2d 254, 261 (1st Cir. 1990). The burden is on the defendant to show that he had standing to challenge the search of the silver car in this case. *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988).

The defendant's attempt to meet this burden falls short. He relies primarily on case law concerning reasonable expectations of privacy in residences, rather than the case law that is specific to such expectations on the part of passengers in vehicles they do not own. Memorandum on Suppression Issues (Docket No. 58) at [4]-[8]. He argues that he has standing to challenge the search because he was forcibly removed from the vehicle and he asserts a property interest in the gun found inside the car "for purposes of this motion alone." *Id*. at [7].[4] Of course, any criminal defendant could assert a property interest only for the purposes of a motion to suppress in any evidence seized that might be used against him or her.

---

[4] The defendant also relies on the assertion that "[t]he government asserts that the defendant specifically placed the gun into the trunk through an opening available in the passenger compartment in an effort to secret[e] this item[,]" as evidence of "a subjective intent o[n] the part of the defendant to maintain privacy interests in the vehicle." Memorandum on Suppression Issues at [7]. The government has made no such argument or assertion. Even if it had, the defendant's attempt to use such an action on his part to establish standing to challenge the search of the vehicle stands several decades of Fourth Amendment jurisprudence on its head.

Nonetheless, assuming *arguendo* that the defendant has established that he had a subjective expectation of privacy inside the car driven by his girlfriend and rented by her father, he has not established that this expectation was objectively reasonable. *Aguirre*, 839 F.2d at 856-57. *See generally United States v. Bouffard*, 917 F.2d 673, 677-78 (1st Cir. 1990); *United States v. McHugh*, 769 F.2d 860, 864 (1st Cir. 1985). Indeed, Mercier, the driver of the car, told the officers that it was possible that the defendant had placed a weapon in the car, which suggests that he did not attempt to keep the gun's presence "private" from others. In addition, ownership of the article seized does not automatically confer standing. *United States v. Goshorn,* 628 F.2d 697, 700 (1st Cir. 1980).

Even if the defendant had standing to challenge the search, however, Mercier consented to the search, and that consent was sufficient. The defendant appears to be attempting to assert Mercier's constitutional rights when he argues that her consent was not valid, a legal avenue that is not open to him. Again, even if that were not the case, defense counsel's contention in oral argument that her consent was invalid because she "may have been only 19" years old at the time, she was "stopped by six or seven officers with guns pointed at her,"[5] she was handcuffed and "may have been told to get on her knees or prone,"[6] and she was placed in a police car with a police officer "in proximity at all times," so that her consent was coerced and involuntary, cannot succeed.

By the time Mercier was asked for consent to search the car, the handcuffs had been removed, she was outside the police car, and Gosselin testified that she had "calmed down" since the time when the handcuffs were first put on. She was an adult. She did not hesitate to give permission to Harrington when he asked, but she did have the presence of mind, when

---

[5] The evidence establishes that only five officers, at most, drew their weapons, and that not all of the guns were pointed at any individual.
[6] The evidence does not support the assertions in quotation marks.

13

Harrington asked her whether there were any weapons in the car, to ask in response whether she could get into trouble if the defendant had put something in the car. She also agreed to go to the police station to give a statement. Defense counsel's argument is pure speculation; on the evidentiary record, there can be no question that Mercier's consent to search the car was given voluntarily.

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and the motion to suppress **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 31st day of October, 2010.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge